George H. BENFORD

v.

AMERICAN BROADCASTING COMPANIES, INC., and Mrs. Isaac (Betty) Hamburger and Miss Kathleen T. Gardner and Mrs. Lillian M. Teitelbaum and David L. Holton and Margaret Osmer.

Civ. A. No. N–79–2386.

United States District Court, D. Maryland.

Nov. 14, 1980.

See also, D.C., 502 F.Supp. 1159.

Wilson K. Barnes, Baltimore, Md., and Dean E. Sharp, Washington, D. C., for plaintiffs.

Alan I. Baron and Ellen Scalettar, Baltimore, Md., for defendants American Broadcasting Co., Inc. and Margaret Osmer.

Stanley M. Brand, Steven R. Ross and Michael L. Murray, Washington, D. C., for defendants Miss Kathleen T. Gardner, Mrs. Lillian M. Teitelbaum, David L. Holton and Mrs. Isaac (Betty) Hamburger.

NORTHROP, Chief Judge.

Plaintiff, George H. Benford, instituted the instant action in the Circuit Court for Baltimore County[1] against American Broadcasting Companies, Inc. (ABC), Margaret Osmer, an ABC employee, David L. Holton, Chief Investigator for the Select Committee on Aging, United States House of Representatives (Select Committee), Kathleen T. Gardner, professional staff member of the Select Committee, and Betty Hamburger and Lillian M. Teitelbaum, both special senior citizen investigators of the Select Committee. Defendants Holton,

Gardner, Hamburger, and Teitelbaum will hereinafter be referred to collectively as the "congressional defendants."

This case arose from the events surrounding the Select Committee's investigation of abuses in the sale of supplemental health insurance to the elderly. Plaintiff Benford is an independent agent of the American Family Life Assurance Company of Columbus, Georgia. His responsibilities include the recruitment and training of independent agents for American Family. On October 20, 1978, and as part of the Select Committee's investigation, defendant Gardner visited Benford's office and expressed her desire to serve as an independent agent. Unaware that Gardner was a member of the Select Committee's investigatory team, Benford hired Gardner as an independent agent.

On or about November 1, 1978, Gardner informed Benford that a friend knew of two elderly women who were interested in learning about American Family's cancer policy. Stating that she was not confident in her ability to handle the sale herself, Gardner asked Benford to accompany her to the meeting. Benford agreed and arrangements were made to meet with the two women, defendants Hamburger and Teitelbaum, at the home of Hamburger in Pikesville, Maryland. On November 3, 1978, Benford and Gardner arrived at Hamburger's home where they were met by defendants Hamburger, Teitelbaum, and Holton, who introduced himself as the friend of Gardner who recommended the meeting.

At the meeting, Benford presented his standard cancer insurance promotion to the women. Without Benford's knowledge or consent, the November 3 meeting at Hamburger's home was taped by ABC. On November 28 and 29, 1978, portions of the taped meeting were broadcast on the ABC Nightly News. Following this broadcast, Benford learned that the congressional defendants were part of the Select Commit-

---

1. Defendants removed this action to federal court by filing a Petition for Removal on December 27, 1979. Plaintiff filed a Motion to Remand on January 10, 1980, that was denied by this Court on March 7, 1980.

tee's investigatory team. As a result of the alleged actions by ABC and the congressional defendants, Benford has instituted the present action claiming that the taping and broadcasting subjects the defendants to liability under the Maryland Wiretapping and Electronic Surveillance Act, Md.Cts. & Jud.Proc.Code Ann. §§ 10–401, *et seq.*, the fourth amendment of the Constitution, the Federal Eavesdropping Statute, 18 U.S.C. §§ 2510, *et seq.*, and the common law torts of civil conspiracy, malicious interference with business relations, and invasion of privacy.

The congressional defendants have filed a motion to dismiss, or alternatively for summary judgment, as to each cause of action. Because both sides have submitted affidavits, the Court will treat defendants' motion as a motion for summary judgment. In addition, the congressional defendants have moved for a protective order staying all discovery until the motions presently before the Court are resolved. These motions raise an important question regarding the congressional defendants' immunity from suit. At present, therefore, this Court is deciding only the threshold question of legislative immunity. The Court is not addressing whether plaintiff has alleged valid causes of action in Counts I through VI. Although the congressional defendants have based their motion to dismiss, or alternatively for summary judgment, on a variety of grounds, this Court is only deciding whether the motion should be denied or granted on the basis of legislative immunity.

In their motion to dismiss, or alternatively for summary judgment, and their motion for a protective order, the congressional defendants contend that their conduct is protected by the Speech or Debate Clause of the Constitution and/or the common law doctrine of official immunity. In considering the congressional defendants' contention, it is important to note that some of the counts in the plaintiff's complaint deal exclusively with the actual taping while others require an examination of both the taping and the subsequent broadcast. As a result, in addressing the issue of legislative immunity, this Court must consider whether the taping, the broadcasting, or both, are absolutely protected by the Speech or Debate Clause or the doctrine of official immunity.

■ For the reasons set forth below, it is the opinion of this Court that neither the taping nor the subsequent broadcasting is absolutely protected by either the Speech or Debate Clause of the doctrine of official immunity. Upon showing that the taping and the broadcasting were properly authorized, however, the congressional defendants will be entitled to assert a defense of qualified immunity.[2] This defense only protects the defendants if they meet their burden of proving that they acted reasonably and in good faith. Whether this is a viable defense under these circumstances, therefore, cannot be resolved at this stage in the proceedings.

## I. THE SPEECH OR DEBATE CLAUSE

■ The congressional defendants' primary contention is that their conduct is absolutely protected by the Speech or Debate Clause of the Constitution, Art. I, § 6, cl. 1.[3] The Speech or Debate Clause was included in the Constitution to insure the independence of the legislative branch and to protect legislators "not only from the

**2.** Following a hearing on the questions addressed in this opinion on October 16, 1980, this Court opined that defendants were not entitled to immunity under either the Speech or Debate Clause or the doctrine of official immunity. This Court's oral observation of October 16 is amended to the extent that, upon a proper showing, the congressional defendants are entitled to assert a defense of qualified immunity.

**3.** Art. I, § 6, cl. 1 of the Constitution provides:

The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

consequences of litigation's results but also from the burden of defending themselves." *Dombrowski v. Eastland*, 387 U.S. 82, 85, 87 S.Ct. 1425, 1427, 18 L.Ed.2d 577 (1967). *See also United States v. Brewster*, 408 U.S. 501, 507, 92 S.Ct. 2531, 2535, 33 L.Ed.2d 507 (1972). As the Supreme Court explained in *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), "[t]he purpose of the protection afforded legislators is not to forestall judicial review of legislative action but to insure that legislators are not distracted from or hindered in the performance of their legislative tasks by being called into court to defend their actions." *Id.* at 505, 89 S.Ct. at 1955.

The Supreme Court has construed the Speech or Debate Clause few times in its history. See *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); *United States v. Helstoski*, 442 U.S. 477, 99 S.Ct. 2432, 61 L.Ed.2d 12 (1979); *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975); *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1975); *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972); *United States v. Brewster*, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972); *Powell v. McCormack*, 395 U.S. 486, 86 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967); *United States v. Johnson*, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966); *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); *Kilbourn v. Thompson*, 103 U.S. 168, 26 L.Ed. 377 (1881). In these cases, the Court has read the Speech or Debate Clause "broadly to effectuate its purposes ...." *United States v. Johnson*, 383 U.S. at 180, 86 S.Ct. at 755. Among the actions the Court has deemed protected under the Clause are voting by legislators, the preparation of committee reports, and conduct at legislative committee hearings. *See Gravel*, 408 U.S. at 624, 92 S.Ct. at 2626. In addition, "a published report may, without losing Speech or Debate Clause protection, be distributed to and used for legislative purposes by Members of Congress, congressional committees, and institutional or individual legislative functionaries." *Doe v. McMillan*, 412 U.S. at 312, 93 S.Ct. at 2024.

■ Moreover, the Court has unequivocally declared that the Speech or Debate Clause protects legislative aides as well as the legislators themselves. In *Gravel*, the Court stated that "for the purpose of construing the privilege a Member and his aide are to be 'treated as one,' ...." 408 U.S. at 616, 92 S.Ct. at 2622 (quoting from *United States v. Doe*, 455 F.2d 753, 761 (1st Cir. 1972)). The Court has indicated, however, that the protection afforded legislative aides may not be as great as that afforded the legislators. As the Court stated in *Dombrowski*, "This Court has held, however, that this doctrine is less absolute, although applicable, when applied to officers or employees of a legislative body, rather than to legislators themselves." 387 U.S. at 85, 87 S.Ct. at 1427. Similarly, in *Tenney v. Brandhove*, the Court declared that when a legislator is sued the Clause "deserves greater respect than where an official acting on behalf of the legislature is sued ...." 341 U.S. at 378, 71 S.Ct. at 789.

■ Although the Speech or Debate Clause has been broadly construed, the Court has placed definite limits on the scope of its protection. In *Gravel*, the Court defined the scope of the Clause as follows:

Legislative acts are not all-encompassing. The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, *they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings* with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House. As the Court of Appeals put it, the courts have extended the privilege to matters beyond pure speech or debate in either House, but "only when necessary to prevent indirect impairment of such deliberations."

408 U.S. at 625, 92 S.Ct. at 2627 (quoting from *United States v. Doe*, 455 F.2d at 760) (emphasis added). As the Court explained in *Brewster*,

> In no case has this Court ever treated the clause as protecting all conduct *relating* to the legislative process. In every case thus far before this Court, the Speech or Debate Clause has been limited to an act which was clearly a part of the legislative process–the *due* functioning of the process.

408 U.S. at 515–16, 92 S.Ct. at 2538–39 (footnotes omitted). Thus, the Speech or Debate Clause "does not extend beyond what is necessary to preserve the integrity of the legislative process." *Id.* at 517, 92 S.Ct. at 2540.

This Court will now separately consider whether either the taping or the subsequent broadcasting is within the scope of absolute protection afforded by the Speech or Debate Clause.

### A. The Public Broadcast of the Taped November 3 Meeting

As part of the ABC Nightly News on November 28 and 29, 1978, ABC aired excerpts from the tapes made of Benford's meeting with the congressional defendants. The Court must first address whether this public broadcast was conduct protected by the Speech or Debate Clause. Applying the *Gravel* standard, therefore, the Court must determine whether the broadcast was "an integral part of the deliberative and communicative processes by which members participate in committee and House proceedings . . . ." *Gravel*, 408 U.S. at 625, 92 S.Ct. at 2627.

In recent decisions concerning the scope of the Speech or Debate Clause, the Supreme Court has exhibited a reluctance to extend the protective shield to the private publication of materials obtained in the course of legitimate legislative activity.

In *Gravel*, the Supreme Court considered whether a grand jury had the power to subpoena an aide of a United States senator for questioning with regard to the senators arrangement for the private publication of classified documents. In June 1971, Sena-

tor Mike Gravel convened a meeting of the Subcommittee on Buildings and Grounds of the Senate Public Works Committee and there read extensively from a copy of the Pentagon Papers. The entire 47 volumes of the study were then placed in the public record. Soon thereafter, Senator Gravel arranged for publication of these papers by Beacon Press. The Supreme Court held that, though the motives behind the Senator's conduct at the subcommittee meeting were protected by the Speech or Debate Clause, the arrangement for the publication by Beacon Press was not. The *Gravel* Court explained that the "private publication by Senator Gravel through the cooperation of Beacon Press was in no way essential to the deliberations of the Senate; nor does questioning as to private publication threaten the integrity or independence of the Senate by impermissibly exposing its deliberations to executive influence." *Id.*

The Court faced a similar question in *Doe v. McMillan, supra.* In *Doe*, parents of District of Columbia school children brought an action against congressional committee members and aides, and executive officials, seeking damages and injunctive relief for invasion of privacy resulting from the dissemination of a congressional report on the District of Columbia school system that included identification of students in a derogatory context. The *Doe* Court took a step beyond *Gravel* holding that even congressional authorization does not immunize the publication and distribution of materials "which allegedly infringe upon the rights of individuals." 412 U.S. at 314, 93 S.Ct. at 2025.

The United States Court of Appeals for the District of Columbia in *McSurley v. McClellan*, 553 F.2d 1277 (D.C.Cir.1976) (en banc), followed the Supreme Court decisions in *Gravel* and *Doe.* In *McSurley*, plaintiffs instituted an action against a United States senator and two of his aides for an alleged violation of plaintiffs' constitutional rights. The action arose in part from defendants' appropriation and use of materials taken from plaintiffs' home in the course of an unlawful search. Copies of these docu-

ments were later disseminated to persons or agencies outside the subcommittee. In holding the public distribution unprotected, the District of Columbia Circuit stated: "To the extent plaintiffs charge dissemination outside of the Halls of Congress, the federal defendants are not immune to further questioning." *Id.* at 1285.

*Hutchinson v. Proxmire, supra,* is the most recent attempt by the Supreme Court to define the scope of "legitimate legislative activity." *Proxmire* arose from Senator Proxmire's award of the "Golden Fleece of the Month Award" to publicize wasteful government spending. One such award was given to federal agencies involved in the funding of plaintiff's study of emotional behavior. In publicizing the award, Senator Proxmire distributed a press release and a newsletter that incorporated defamatory statements made in a speech given by him.[4] The question before the Court was whether the private republication of the Senator's speech through the press release and newsletter was absolutely protected by the Speech or Debate Clause.

The *Proxmire* Court reaffirmed the *Gravel* definition of the scope of the Clause stating that, to be immune, legislative acts "must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings ...." 443 U.S. at 126, 99 S.Ct. at 2682, (quoting from *Gravel,* 408 U.S. at 625, 92 S.Ct. at 2627). Following *Gravel* and *Doe v. McMillan,* the Court stated that, though

[a] speech by Proxmire in the Senate would be wholly immune and would be available to other Members of Congress and the public in the Congressional Record[,] ... neither the newsletters nor the press release was "essential to the deliberations of the Senate" and neither was part of the deliberative process.

*Id.* at 130, 99 S.Ct. at 2686 (quoting from *Gravel,* 408 U.S. at 625, 92 S.Ct. at 2627). If the Supreme Court saw fit to deny a senator Speech or Debate Clause protection for the private publication of a speech properly contained in the Congressional Record, there is little reason for this Court to immunize the conduct of committee investigators in arranging for the publication of materials acquired in the course of a legislative investigation.

[6] It is the opinion of this Court that, like the public dissemination of materials in *Gravel, Doe, McSurley,* and *Proxmire,* the publication of the taped meeting of November 3 was not "an integral part of the deliberative and communicative processes" of the Select Committee. It is not necessary for this Court to pass on whether the tapes could have been properly used in another context. This Court is merely stating that it sees no legitimate reason for the publication of portions of the taped meeting on the ABC Nightly News.

■ The congressional defendants contend that the publication was justified in furtherance of the "informing function" of Congress.[5] The Supreme Court, however, has never advocated a broad reading of the "informing function." Certainly, the Court

---

4. There is apparently some question as to whether Senator Proxmire actually delivered the speech on the senate floor or merely had the speech read into the Congressional Record. *See Proxmire,* 443 U.S. at 116 n.3, 99 S.Ct. at 2678.

5. In explaining the importance of the legislature's "informing function," Justice Douglas quoted from a variety of sources as follows: "[i]t is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees.... The *informing function* of Congress should be preferred even to its legislative function." W. Wilson, Congressional

Government 303 (1885), quoted with approval in *Tenney v. Brandhove,* ... 341 U.S. at 377 n.6 [71 S.Ct. at 788] .... "From the earliest times in its history, the Congress has assiduously performed an 'informing function,'" *Watkins v. United States,* 354 U.S. 178, 200 n.33 [77 S.Ct. 1173, 1185, 1 L.Ed.2d 1273] .... "Legislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them." *Bond v. Floyd,* 385 U.S. 116, 136, 87 S.Ct. 339, 349, 17 L.Ed.2d 235 ....
*Gravel,* 408 U.S. at 636, 92 S.Ct. at 2630 (Douglas, J., dissenting).

has never used this rationale to justify the immunization of the public distribution of injurious materials. As the Court stated in *Doe v. McMillan*, "we cannot accept the proposition that our conclusion, that general, public dissemination of materials otherwise actionable under local law is not protected by the Speech or Debate Clause, will seriously undermine the 'informing function' of Congress." 412 U.S. at 317, 93 S.Ct. at 2027. More recently, the Supreme Court declared that: "Valuable and desirable as [the informing function] may be in broad terms, the transmittal of such information by individual Members in order to inform the public and other Members is not a part of the legislative function or the deliberations that make up the legislative process." *Proxmire*, 443 U.S. at 133, 99 S.Ct. at 2687. Accordingly, though this Court does not question the value of the "informing function" of Congress, this Court sees no legitimate reason for using it as a means of protecting the publication of materials injurious to private individuals.

### B. The Taping of the November 3 Meeting

Having determined that the broadcast on the ABC Nightly News is unprotected by the Speech or Debate Clause, this Court must now address the more difficult question of whether the conduct of the congressional defendants in surreptitiously taping the November 3 meeting is deserving of such protection. In asserting their right to Speech or Debate Clause protection, the congressional defendants stress the appropriateness of the investigation. They emphasize that the investigatory tactics utilized in this case were necessary to obtain accurate and reliable information.

■ Although the legislative branch has broad investigatory power,[6] "a Member of Congress or congressional employee is not free to use every conceivable means to obtain investigatory materials, without fear of criminal prosecution or civil suit." *McSurley v. McClellan*, 553 F.2d at 1287. In *Gravel*, the Supreme Court noted that in prior decisions it had taken "a decidedly jaundiced view towards extending the Clause so as to privilege illegal or unconstitutional conduct beyond that essential to foreclose executive control of legislative speech or debate and associated matters such as voting and committee reports and proceedings." 408 U.S. at 620, 92 S.Ct. at 2624. More specifically, the *Gravel* Court explained that

> no prior case has held that Members of Congress would be immune if they executed an invalid resolution by themselves carrying out an illegal arrest, or *if, in order to secure information for a hearing, themselves seized the property or invaded the privacy of a citizen.* Neither they nor their aides should be immune from liability or questioning in such circumstances.

*Id.* at 621, 92 S.Ct. at 2625 (emphasis added).

■ In *Dombrowski v. Eastland, supra,* the Supreme Court faced facts similar to those in the instant case. In *Dombrowski*, plaintiff brought an action against the Chairman and counsel of a Senate subcommittee. Plaintiff claimed that, while in the process of gathering information for a hearing, the defendants conspired with Louisiana officials to seize plaintiff's property by unlawful means in violation of plaintiff's fourth amendment rights.[7] The *Dombrowski* Court held that the Speech or Debate Clause does not protect the committee counsel against an alleged violation of an indi-

---

6. *See Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 224 (1975) in which the Court stated: "To conclude that the power of inquiry is other than an integral part of the legislative process would be a miserable reading of the Speech or Debate Clause in derogation of the 'integrity of the legislative process.'" *Id.* at 505, 95 S.Ct. at 1822 (quoting from *United States v. Brewster*, 408 U.S. at 524, 92 S.Ct. at 2531). *See also*

*Doe v. McMillan*, 412 U.S. at 313, 93 S.Ct. at 2025; *McGrain v. Daugherty*, 273 U.S. 135, 175, 71 L.Ed. 580, 47 S.Ct. 319 (1927).

7. The Louisiana courts held the arrests and searches illegal because the warrants secured by the police were not supported by a showing of probable cause. *See* Dombrowski, 387 U.S. at 83, 87 S.Ct. at 1426.

vidual's fourth amendment rights.[8] Therefore, *Dombrowski* appears to stand for the proposition that a legislative aide is not immune when an individual claims a violation of his fourth amendment rights, provided the plaintiff has set forth facts showing a genuine issue for trial.

In *McSurley v. McClellan*, a legislator and two of his aides were sued for conspiring with state officials to effect an unlawful search and seizure. The District of Columbia Circuit unequivocally declared that the employment of unlawful or unconstitutional methods of investigative inquiry is "no part of the legislative process or function; it is not a legislative act." *McSurley v. McClellan*, 553 F.2d at 1288 (quoting from *Brewster*, 408 U.S. at 526, 92 S.Ct. at 2544). The *McSurley* court, like the Supreme Court in *Dombrowski*, refused to extend the shield of the Speech or Debate Clause to allegedly unlawful or unconstitutional investigatory practices.

As in both *Dombrowski* and *McSurley*, plaintiff in the instant action has alleged that the taping of the November 3 meeting was both unlawful and unconstitutional. Without deciding whether the actions of the congressional defendants were unlawful or unconstitutional, and, if so, if other defenses are available, this Court is of the view that there is sufficient evidence in the record "which affords more than merely colorable substance" to plaintiff's claims. *See Dombrowski*, 387 U.S. at 84, 87 S.Ct. at 1427.

Moreover, the gravity of plaintiff's allegations are not mitigated by the possibility that a court might have granted a request by the congressional defendants to allow the taping of the meeting. As the *McSurley* court explained, "Instead of acting lawlessly, the Subcommittee investigator should have used proper process which, in turn, would have permitted the court, if it granted the request ... to safeguard

against encroachment beyond the legitimate legislative sphere, into personal and private papers that lacked even arguable relevance to the legislative inquiry." 553 F.2d at 1292. The congressional defendants in the instant action had ample opportunity to request judicial permission prior to the meeting of November 3. Such permission is vital to "safeguard encroachment beyond the legitimate legislative sphere."

It is not necessary, at this point in the proceedings, for this Court to explore the appropriateness of issuing an order under the facts of the present action. This Court merely makes the point that no court order was sought to tape the conversation, even for the purposes of using the tapes at a committee hearing or to aid in drafting a committee report.

## II. THE DOCTRINE OF OFFICIAL IMMUNITY

Having determined that the Speech or Debate Clause protects neither the broadcasting nor the taping, our inquiry is not at an end. The congressional defendants contend that if it is adjudged that they are not absolutely immune under the Speech or Debate Clause, they are entitled to absolute or qualified immunity under the doctrine of official immunity. To the extent that their conduct is authorized, this Court is of the view that the congressional defendants are entitled to assert a qualified immunity.

The judicially created doctrine of official immunity confers immunity on government officials for discretionary acts within the scope of their authority. This doctrine is designed to reconcile two important considerations,

on the one hand, the protection of the individual citizen against pecuniary damage caused by oppressive or malicious action on the part of officials of the Federal Government; and on the other, the pro-

---

8. The Court agreed with the lower courts' dismissal of the complaint as to the committee Chairman because "[t]he record [did] not contain evidence of his involvement in any activity that could result in liability." As to the committee counsel, however, the Court noted that there was "controverted evidence in the record ... which affords more than merely colorable substance" to plaintiff's claim that there had been an unconstitutional infringement upon his fourth amendment rights. *Id.* 387 U.S. at 84, 87 S.Ct. at 1427.

tection of the public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or ill–founded damage suits brought on account of action taken in the exercise of their official responsibilities. *Barr v. Matteo*, 360 U.S. 564, 565, 79 S.Ct. 1335, 1336, 3 L.Ed.2d 1434 (1959).

In *Barr*, the Supreme Court reaffirmed the official immunity doctrine. In that case, the acting director of a federal agency was sued for malicious defamation by two employees whose suspension for misconduct was announced in a press release. The Court concluded that the press release was "within the outer perimeter of [the acting director's] line of duty" and "was an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively." *Id.* at 575, 79 S.Ct. at 1341. Consequently, the Court held that a false and injurious publication, the issuance of which was otherwise within the scope of his authority, was not actionable notwithstanding that its issue was allegedly malicious.

In *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Supreme Court limited the absolute immunity afforded to federal officials by its decision in *Barr*. In *Butz*, federal agency officials were sued for the wrongful initiation of administrative proceedings against the plaintiff. The Court held that when federal officials are sued for allegedly unconstitutional conduct they are entitled only to the qualified immunity described in *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).[9] 438 U.S. at 507, 98 S.Ct. at 2911. The Court explained that the removal of absolute protection would not render the federal officials liable for mere mistakes in judgment. It would, however, make federal officials liable if they knew or reasonably should have known that their conduct violated the Constitution. *Id.*

The *Butz* Court utilized the definition of qualified immunity that the Court applied to state officials in *Scheuer*. The *Scheuer* Court explained that

in varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good–faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

*Scheuer*, 416 U.S. at 247–48, 94 S.Ct. at 1691–92. The Court subsequently applied the *Scheuer* standard in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), stating that a school board member would not be immune if "he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or *other injury to the student*. *Id.* at 322, 95 S.Ct. at 1000. (emphasis added).

 The scope of official immunity is directly related to the degree of authorization. As the Supreme Court explained in *Doe v. McMillan*, "The scope of immunity has always been tied to the 'scope of . . . authority.'" 412 U.S. at 320, 93 S.Ct. at 2028 (quoting from *Wheeldin v. Wheeler*, 373 U.S. 647, 651, 83 S.Ct. at 1441, 1444, 10 L.Ed.2d 605 (1963)). To be entitled to official immunity, therefore, the federal officials must show that their conduct was authorized. The mere fact that certain conduct is authorized, however, is insufficient, in itself, to immunize the conduct of federal officials. *See Doe v. McMillan*, 412 U.S. at 322, 93 S.Ct. at 2029. In addition to showing proper authorization the federal offi-

---

9. The Court in *Butz* explained, however, that federal officials may be afforded absolute immunity in "exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business." 438 U.S. at 507, 98 S.Ct. at 2911.

**1158**

cials must show that they acted reasonably and in good faith.

■ Although commonly applied to officials within the executive branch of government, the official immunity doctrine is applicable to members of the legislative branch. In *Doe v. McMillan*, the Supreme Court specifically stated that "[b]oth before and after *Barr*, official immunity has been held applicable to officials of the Legislative Branch." 412 U.S. at 319 n.13, 93 S.Ct. at 2028.[10] A number of lower courts have also recognized the possibility of extending the official immunity doctrine to legislative officials. The District of Columbia Circuit in *McSurley*, for example, after holding that the legislative defendants were not absolutely protected by the Speech or Debate Clause, acknowledged that "there may be available to [the defendant] a qualified defense to the damages action (not an absolute immunity from suit) of 'good faith and reasonable belief in the validity of the search' . . . ." *McSurley v. McClellan*, 553 F.2d at 1291 n.50 (quoting from *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 456 F.2d 1339, 1348 (2d Cir. 1972)) (the *McSurley* court expressly asserted, however, that this was a matter on which it expressed no opinion).[11] Similarly, in *Davis v. Passman*, 544 F.2d 865 (5th Cir. 1977), *aff'd en banc*, 571 F.2d 792 (5th Cir. 1978), *rev'd on other grounds*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), the Fifth Circuit declared that "[t]he inapplicability of speech or debate protection does not foreclose Representative Passman from asserting the same qualified immunity

available to other government officials." *Id.* at 881

■ Absolute official immunity, when applied to the legislative branch, is at most coextensive with the absolute protection afforded by the Speech or Debate Clause. In the panel opinion in *Davis v. Passman*, the Fifth Circuit, though allowing Representative Passman qualified immunity, denied him the right to absolute official immunity stating: "The inapplicability of speech or debate protection does, however, foreclose Representative Passman from asserting an absolute official immunity such as that recognized in *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) [(absolute immunity accorded a state prosecutor)]. Speech or debate protection is coextensive with the need to afford members of Congress absolute immunity." 544 F.2d at 881. Similarly, this Court sees no justifiable reason for affording the congressional defendants absolute official immunity when these officials are not deserving of absolute protection under the Speech or Debate Clause. The right of legislative officials to absolute immunity is limited to the protection accorded by the Speech or Debate Clause.

■ Moreover, the scope of absolute official immunity recognized in *Barr v. Matteo* was greatly limited by the Supreme Court's decision in *Butz*. The Court in *Butz* held that in a suit alleging unconstitutional action, federal officials were only entitled to absolute immunity in "exceptional situations." 438 U.S. at 507, 98 S.Ct. at 2911.[12] It is the opinion of this Court that absolute

---

**10.** *But see Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) in which the Court explained:

The decision of the panel of the Court of Appeals for the Fifth Circuit found that [Representative Passman] was not foreclosed "from asserting the same qualified immunity available to other government officials. . . ." The en banc Court of Appeals did not reach this issue, and accordingly we express no view concerning its disposition by the panel. *Id.* at 246 n.25, 99 S.Ct. at 2277.

**11.** In his dissenting opinion in *McSurley*, Judge Wilkey clearly assumed that absent the absolute protection of the Speech or Debate Clause

the legislative defendants would have access to qualified official immunity. After acknowledging the majority's decision to deny the Senator and his aides immunity under the Speech or Debate Clause, Judge Wilkey stated that "[o]f course, the defendants will have the protection of qualified immunity, as in *Bivens v. Six Unknown Agents* or *Scheuer v. Rhodes*." *McSurley v. McClellan*, 553 F.2d at 1304–05 (Wilkey, J., dissenting) (footnotes omitted).

**12.** The Court noted that judges and prosecutors were examples of officials who were deserving of absolute immunity. *Butz*, 438 U.S. at 508–17, 98 S.Ct. at 2911–16.

immunity is not essential to safeguard the interests of legislative investigators. For the foregoing reasons, therefore, the congressional defendants in the present action do not enjoy absolute official immunity.

The qualified immunity of *Butz* and *Scheuer,* which the Court has held applicable to federal executive officers, should be equally applicable to legislative officers. There is no rational reason to afford executive investigators greater protection than members of the legislative branch. Moreover, extending a qualified protection to legislative investigators serves to safeguard the constitutional rights of private individuals without unduly frustrating the ability of Congress to legislate effectively. To the extent that the broadcasting and taping were authorized, therefore, the congressional defendants may assert qualified immunity. A decision on the viability of this defense, however, must await further proceedings.

### III. CONCLUSION

In conclusion, this Court holds that the congressional defendants are not absolutely immune under either the Speech or Debate Clause or the official immunity doctrine. Upon a proper showing, however, they are entitled to assert a defense of qualified immunity as defined by the Supreme Court in *Butz.* Accordingly, to the extent that the congressional defendants have asserted absolute immunity as a basis for their motion to dismiss or in the alternative for summary judgment, the motion is denied.[13] In addition, the congressional defendants' motion for a protective order is denied.

A separate Order will be entered to effectuate the rulings of this opinion.

---

**13.** As previously stated, the Court will address the balance of defendants' contentions in support of their motion to dismiss, or alternatively for summary judgment, at a later proceeding.